SOPHIE PLOTNIKOFF, Respondent-Appellant, v JEANETTE FINKEL-STEIN, Appellant-Respondent.

First Department, December 13, 1984

**APPEARANCES OF COUNSEL**

*Alan C. Glickenhouse* of counsel (*Karp & Silver*, attorneys), for appellant-respondent.

*Mark X. Lynch* for respondent-appellant.

**OPINION OF THE COURT**

SULLIVAN, J.

In 1964 plaintiff, then 78 years of age and recently widowed, began to peddle merchandise purchased at discount on the Lower East Side of New York door to door in the Bronx neighborhood in which she lived. Successful from the outset, plaintiff soon began to accumulate substantial sums of money, which she deposited in various accounts opened either jointly in her name with, or in trust for, one of her four daughters. In 1979, at the suggestion of her eldest daughter, Sadie Dietz, plaintiff consolidated these various accounts, then totaling approximately $83,000, into three accounts in her name jointly with that of her youngest daughter, defendant, Jeanette Finkelstein, herself a widow. The passbooks were then mailed to defendant at her home in Binghamton, New York.

Sometime thereafter, in 1981, plaintiff and defendant had a falling out, which led eventually to the commencement of this lawsuit wherein plaintiff seeks, *inter alia,* an accounting of all moneys taken from the three joint bank accounts and the return of any passbooks and certificates of account and bonds in their joint names, as well as a direction that defendant convey her remainderman's interest in a Florida condominium to plaintiff. Mrs. Dietz and her brother, who had been virtually disinherited, sided with plaintiff. Plaintiff alleged that she never intended to create a joint tenancy in the bank accounts and bonds, and that defendant's retention of a reversionary interest in the condominium constitutes unjust enrichment. After a trial, nonjury, Trial Term, except for certain findings neither appealed nor herein relevant, ruled in plaintiff's favor.

When asked at trial why defendant's name was placed on the accounts plaintiff, who, purportedly, can neither read nor write English, responded, "I did put Jeanette, survivor; a survivor if I drop dead." Plaintiff also testified, however, that she never intended to make a gift of the money in these accounts, but opened them in their joint names solely to facilitate defendant's management and investment of her money. Defendant, on the other hand, testified that her mother had made a gift to her of the bank accounts, some similarly held Israeli and Con Edison bonds, and her reversionary interest in the Florida condominium.

Rejecting defendant's claim that she had been the recipient of plaintiff's largesse Trial Term found that defendant's name was placed on the bank accounts and bonds for convenience. We have no quarrel with this finding, especially in light of the manner in

which defendant managed the bank accounts. She testified that she ultimately withdrew all the money from the accounts and opened, in her and her mother's name, time deposit accounts, as well as a money market account. She never withdrew from these accounts for her own personal use and was always careful to keep her own money in separate accounts. The joint accounts opened by defendant bore her mother's Social Security number, and defendant never included any of the interest income from these accounts in her own income tax return. All of these circumstances, of course, militate against not only defendant's assertion of a gift of the entirety but her claim, raised for the first time on appeal, to a moiety in the joint accounts, as well.

■ The presumption of joint tenancy created by the deposit of money in an account in the name of the depositor and another, and in form to be paid to either of them or the survivor (Banking Law, § 675, subd [b]) is rebuttable. (*Moskowitz v Marrow,* 251 NY 380, 397, 399.) Where the joint account is created as a matter of convenience and without any intention of conferring a beneficial interest upon the codepositor, the presumption is rebutted. (*Matter of Phelps v Kramer,* 102 AD2d 908; *Phillips v Phillips,* 70 AD2d 30, 38.) Thus, Trial Term properly directed defendant to account for any moneys withdrawn by her from the joint accounts and to deliver any passbooks and the funds in any money market accounts held jointly, as well as any bonds similarly held.

■ We disagree, however, with Trial Term's disposition of plaintiff's claim to the ownership of the Florida condominium which she purchased in 1977 for $15,000. Plaintiff testified that she entrusted the details of the purchase to her daughter Molly Englander and Molly's husband, Morris, both of whom have since died, and who, with plaintiff and Mrs. Dietz, were present at the closing in Florida. After the "real estate" man explained the legal implications of such a conveyance to plaintiff — if she died the property would go to defendant — title was taken in defendant's name with a life estate in plaintiff. The record is clear that at no time did defendant attempt to influence her mother as to the manner in which title was to be taken. In fact, it is conceded that she had nothing to do with the purchase. In due course the deed was mailed to her. Defendant testified, as already noted, that her mother told her that the condominium was a gift to her. Yet, on such a record Trial Term held that defendant would be unjustly enriched if she were permitted to retain her interest in the condominium and, accordingly, impressed a constructive trust upon the property and ordered it transferred to plaintiff. This, in our view, was error.

"A person may be deemed to be unjustly enriched if he (or she) has received a benefit, the retention of which would be unjust * * * A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties. It is a conclusion reached through the application of principles of equity." (*Sharp v Kosmalski,* 40 NY2d 119, 123.)

Not only is the finding of unjust enrichment unsupported by the evidence, it is in large part belied by plaintiff's concession that defendant had nothing to do with the purchase of the Florida condominium. The record is devoid of any hint or suggestion that defendant in any manner took advantage of her mother in regard to that transaction. As the evidence reflects, defendant never knew of the purchase or that title was being taken in her name until the matter was a *fait accompli.* Nor is there any evidence that plaintiff's son-in-law, Morris Englander, who counseled plaintiff in the purchase of the condominium and other matters of a financial nature, was guilty of any fraud or deception. He certainly had nothing to gain by a conveyance taken in defendant's name with a life estate in plaintiff. Indeed, as defendant aptly notes, a conveyance in such form deprived his own wife of a possible legacy or intestate share in the property.

Concededly, unjust enrichment does not require the performance of any wrongful act by the one enriched and, thus, even an innocent party may be unjustly enriched. (*Simonds v Simonds,* 45 NY2d 233, 242.) The circumstances of defendant's acquisition of title to the condominium, however, are not such "that in equity and good conscience [s]he ought not to retain it" (*Miller v Schloss,* 218 NY 400, 407). The evidence discloses that the closing took place in the office of plaintiff's lawyer, in the presence of plaintiff, her son-in-law, and two of her other daughters, and only after the legal import of the transaction had been explained to her. As plaintiff testified, "[The real estate man] said, 'My son-in-law insists, that if anything, if I die, it goes right to her. No trouble.' So he made it like that * * * I didn't know. I didn't know what they were doing to me. I was stupid."

Plaintiff does not claim that her will was overborne or that she lacked the capacity to understand what was happening. Indeed, such a hypothesis would be hard to accept. A quick reading of her testimony shows plaintiff, at age 97, and with assets worth approximately $150,000, to be a shrewd and nimble witness, with all her faculties intact. It was she, at the age of 91, not her children or son-in-law, who found a newspaper advertisement of a "cheap condominium" for sale in Florida. While,

upon reflection, she may have been "stupid" in providing defendant with a remainder interest in the condominium, plaintiff, as the record reflects, knew and understood precisely what she was doing. No doubt she had second thoughts in 1981 when she attempted to sell the condominium for $31,000 and defendant refused to consent. But such refusal in no way evinces a fraud or overreaching on defendant's part in 1977 in the taking of title in her name. A constructive trust is "fraud-rectifying" rather than "intent-enforcing". (*Bankers Security Life Ins. Soc. v Shakerdge,* 49 NY2d 939; *Matter of Wells,* 36 AD2d 471, 474-475, affd 29 NY2d 931.) Thus, in the circumstances, the invocation of equity cannot be justified.

Although not a rigid prerequisite to the imposition of the equitable remedy of constructive trust, which, of necessity, is a doctrine of some elasticity (*Simonds v Simonds,* 45 NY2d, at p 241), the presence of a promise and a transfer in reliance thereon is usually required, in addition to unjust enrichment and a confidential or fiduciary relationship. (*Sharp v Kosmalski,* 40 NY2d, at p 121, and cases cited.) This record does not contain any evidence that defendant ever promised, expressly or by her conduct, that she would surrender her reversionary interest to her mother. Nor did anyone else do so in her behalf. No such promise should be implied.

It is fairly obvious that in 1977 plaintiff, solicitous of the needs of defendant, her youngest daughter, recently widowed and with physical infirmities, undertook to provide her with a measure of security. Plaintiff has apparently undergone a subsequent change of heart, which is her prerogative. The shifting whims of familial intercourse cannot, however, provide a basis for the imposition of a constructive trust.

Accordingly, the judgment, Supreme Court, Bronx County (Cotton, J.), entered April 15, 1983, should be modified, on the law and the facts, without costs or disbursements, to the extent of dismissing the second cause of action, which seeks relief with respect to the Florida condominium, and, except as thus modified, affirmed.

Asch, J. (dissenting). Contrary to the view expressed by the majority, the evidence amply supports the finding by Cotton, J., at Trial Term of unjust enrichment on the part of defendant with respect to the Florida condominium. Thus, on direct, plaintiff in testifying about the purchase of the condominium said:

"So Molly — they're dead, it's no use talking, they went with me, they took me with the car and they came in and we find the

condiminium [*sic*] and it was cheap enough, I said, unfortunately, I had my money with me that I took along for Florida, and I had $500.00 deposit and the owner says, 'In two months, I can give you title right away, and I get, in two months, in February, you come and you get title.'

" 'We made up the date to take title and you take it over.' So I went, I had the bankbook, $14,000. In the Greenwich Bank, I think it's in the Greenwich, it was a couple of years, and I took a check from the bankbook and I went back two months later and they went with me. Molly went with me to the real estate and we made — they made me sigh [*sic*], *I don't know what did I sign?* I trusted them. I trust all my children. My pocketbook was their pocketbook.

*"So I gave them and I signed, I don't know what I signed.* And for a couple of years, my son-in-law used to take — pay my rent and pay everything that was in New York" (emphasis added).

Plaintiff also testified in response to questioning on direct:

"Q. Did you ask Morris or Jeanette to put title to that condiminium [*sic*] in Jeanette's name?

"A. No. I didn't even know. In fact, when Sadie started as the real estate, asked her, why did they do it? So he says, we insist."

On cross-examination, the issue of whether plaintiff agreed to give a "gift" of a remainder interest in the condominium was explored at length by counsel. It appears clear that plaintiff did not know that her son-in-law, Morris Englander, had given defendant a remainder interest in the condominium. Thus, plaintiff testified:

"A. I didn't know that it belonged to her [defendant]. I didn't know. This is the dead one. Then *I discovered when Sadie wanted to sell it* [i.e., in 1981, not 1977 when purchased], she discovered that she's the one that — no — they, they insist, if I die, it goes right to her.

"Q. Who insisted?

"A. The one sho's [*sic* — who's] dead, my daughter —

"Q. And did you agree with him?

"A. She didn't know for nothing. She wasn't there. She wasn't alive then.

"Q. Correct. And I agree with you. But did you agree with your son? Wasn't his name Englander —

"A. He does everything for me. He paid my rent, I didn't know from nothing. I trusted my daughter and my son-in-law. They took me and whatever they say, whatever the [*sic*] tell me to sign, I sign.

"Q. And his name was Englander. Wasn't it?

"A. Yes.

"Q. And your daughter's name was what?

"A. Same thing.

"Q. Englander. And didn't they have two children?

"A. It has nothing to do with their children. I had nothing to do with their children. When I bought this, it was through the paper. I went through the paper and bought this condiminium [*sic*]. So they advertised in the paper. I didn't expect nothing and it was a bargain, so I said, 'I have $500.' I went in the bank. I gave her a deposit of $500. because I came to — so they pay and I came in two months later to get the title.

"Q. And what happened when you got title?

"A. When I have title, I had the check in the Greenwich Bank. It was taken out. It was due.

"Q. Who took the money out of Greenwich Savings Bank?

"A. I took a check. I myself, and went to Florida in February, and I went to Florida and went on a Friday with my daughter and with my son. They took me.

"Q. Which daughter and which son?

"A. She's dead. The son-in-law is dead and my daughter is dead.

"Q. That's Englander. Is that correct?

"A. Yes.

"Q. And when you went down and you paid for it, did you tell them who you wanted that condiminium [*sic*] to go to?

"A. There was no name.

"Q. Didn't you just tell us that you wanted Jeanette to have it?

"A. *I didn't want* — when Sadie started to ask why this here, insists, so she ask the real estate, she said, 'Why does it made like that?' He said, *'My son-in-law insists, that if anything, if I die, it goes right to her. No trouble.'* So he made it like that.

"Q. And you agreed with it at that time?

"A. *I didn't know. I didn't know what they were doing to me.* I was stupid * * *

"Q. Going back to when you were there in Florida at the time of the title closing, who was present at that title closing?

"A. Just Molly and Morris, my daughter and son-in-law.

"Q. Were you there?

"A. *I don't know what they were doing.* They were taking care. *I don't know what they did with the real estate,* and I gave them the check, $14,300.00 was their fee" (emphasis added).

Sadie Dietz, plaintiff's daughter and older sister of defendant, testified that her mother "always wanted to own something that she could call her own * * * she was determined to own a piece of property." Mrs. Dietz also testified Morris Englander took care of the apartment and that her mother gave him the money for the monthly maintenance payments on the apartment.

While this court has the power to review the facts and weigh the evidence and in a proper case reverse the determination of the trial court as against the weight of the evidence, the original trier of the facts, Trial Term, herein possessed a great advantage in seeing and hearing the witnesses at firsthand. The fact that the court at nisi prius was better able to evaluate the subtleties of family relationships and to pass upon the credibility, intelligence, bias and other qualities of the witnesses tending to affect the weight and value of their testimony requires that great consideration be given to Trial Term's finding (*Smith v Smith,* 273 NY 380). The eyes and ears of the trial must be those of the Judge who presided, not those of the Justices of the appellate court. The demeanor, the emphases and nuances cannot be reconstituted from the cold words of the record. The decision of the Trial Judge on the facts should not be lightly disturbed by a court which can glean the facts only from the printed pages of a record (see *Rives v Bartlett,* 215 NY 33). This is especially true in the instant case, where the testimony, as can be seen from the quotations herein, is disjointed and rambling.

The majority finds that plaintiff intended to make a gift of the remainder interest in the property. However, Trial Term concluded that: "The proof in the case at bar demonstrates that the plaintiff had no intention to give the defendant a gift of the remainder interest." The issue of donative intent is to be determined by the trier of the facts (*Matter of Housman,* 224 NY 525, 527; *Matter of Kilts,* 54 AD2d 772, 773).

Viewing the evidence in the light most favorable to the successful party (*Matter of Kornblum Metals Co. v Intsel Corp.,* 38 NY2d 376, 379) the finding of the trial court regarding plaintiff's intent must be upheld as supported by the record.

As conceded by the majority, the equitable remedy of constructive trust is a doctrine of some elasticity. It is undisputed that defendant did not know of the remainder interest given to her by Morris Englander at the time of the property's purchase.

"Unjust enrichment, however, does not require the performance of any wrongful act by the one enriched * * * Innocent parties may frequently be unjustly enriched" (*Simonds v Simonds,* 45 NY2d 233, 242).

As Special Term found, the four factors enumerated in *Sharp v Kosmalski* (40 NY2d 119, 121) are present in this case. The majority asserts that the defendant never promised expressly or by her conduct to surrender her reversionary interest. However, Morris Englander occupied a fiduciary relationship to plaintiff, and plaintiff transferred $15,000 to him on his implied promise to purchase the condominium on her behalf.

In any event, we are enjoined by the Court of Appeals not to "rely heavily on formalisms and too little on basic equitable principles, long established in Anglo-American law and in this State and especially relevant when family transactions are involved. 'A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief' (*Beatty v Guggenheim Exploration Co.,* 225 NY 380, 389 [Cardozo, J.], *supra)*" (*Simonds v Simonds, supra,* at p 243).

Accordingly, the judgment of the Supreme Court, Bronx County (Cotton, J.), entered April 15, 1983, after bench trial, in favor of the plaintiff, should be affirmed.

KUPFERMAN, J. P., MILONAS and ALEXANDER, JJ., concur with SULLIVAN, J.; ASCH, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, entered on April 15, 1983, modified, on the law and the facts, without costs and without disbursements, to the extent of dismissing the second cause of action, which seeks relief with respect to the Florida condominium, and, except as thus modified, affirmed.